## BURLINGHAM et al. v. CROUSE et al.

(Circuit Court of Appeals, Second Circuit. August 11, 1910.)

### No. 322.

1. BANKRUPTCY (§ 143*)—ASSETS—INSURANCE POLICIES—RIGHT OF TRUSTEE.

   Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]) § 70, vests the bankrupt's trustee with title to the bankrupt's property, which prior to filing the petition he could by any means have transferred, provided that when the bankrupt shall have any insurance policy, which has a cash surrender value payable to himself, his estate, or personal representatives, he may within 30 days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same pay or secure to the trustee the sum so ascertained, and continue to hold the policy free from the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets. *Held* that, where on the institution of bankruptcy proceedings one of the bankrupts had certain life policies on which the insurance company had loaned a sum equal to the full surrender value, holding the policies as security therefor, the policies did not pass to the bankrupt's trustee.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 201; Dec. Dig. § 143.*]

2. BANKRUPTCY (§ 323*)—COLLATERAL—APPLICATION.

   A bankrupt, having procured certain loans on life insurance policies to the extent of the full surrender value, assigned the policies to C. as security for the return of certain stocks and bonds loaned on a special account, and also to secure other indebtedness. Bankruptcy proceedings having intervened, C. paid the premiums and interest to save the policies from forfeiture, and, the insured having died shortly thereafter, C. received the proceeds of the policies, less the amount of the loan by the insurance company. *Held*, that C., after deducting the amount paid by him for premiums and interest, was bound to apply the balance of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

proceeds first to the payment of the special account, and the balance, if any, to the general indebtedness of the insured to him.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 323.*]

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Action by Charles C. Burlingham and others, as trustees in bankruptcy of T. A. McIntyre & Co., against Charles M. Crouse and the Equitable Life Assurance Society, to recover the proceeds of certain policies on the life of T. A. McIntyre. The proceeds of the policies were paid into court by the insurance company, and from an order adjudging that defendant Crouse was the owner and entitled to the proceeds of the policies, and requiring him to appropriate the proceeds to certain specified purposes, the trustees appeal, and defendant Crouse prosecutes a cross-appeal. Modified and affirmed.

D. Raymond Cobb and Irving L. Ernst, for complainants.

Newell Chapman & Newell, for defendant C. M. Crouse.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. In April, 1902, Thomas A. McIntyre obtained from the Equitable Company two policies upon his life. They were limited life payment policies, and each provided that, upon death of the insured, the company would pay to his executors, administrators, or assigns the sum of $100,000 in 50 annual payments or the sum of $53,000 in cash. On April 14, 1908, the policies were assigned absolutely to the firm of T. A. McIntyre & Co. in which the insured was a partner. On April 24, 1907, they were assigned by T. A. McIntyre & Co. to the Equitable Company as collateral security to a loan of $15,370. We have searched the record in vain to find copies of the agreement with the insurance company by which it loaned the $15,370, and reserved a lien upon the policies to secure repayment. From the language used in a notice sent by it to Crouse, it may be inferred that they contained some provision to the effect that nonpayment of the amount due on or before the day of grace might be taken by the company as a surrender of the policy. On February 25, 1908, T. A. McIntyre & Co. assigned the policies to defendant Crouse as security for the return or repayment of the amount of certain stocks and bonds which he had loaned or was about to loan to the firm. On April 25, 1908, petition in involuntary bankruptcy was filed, and on May 21st the firm and all its members were adjudicated bankrupts. Plaintiffs were elected and qualified as trustees on July 24, 1908.

The suit was brought on the theory that these policies passed to the trustees as property of the bankrupts, that when the transfer to Crouse was made the firm was insolvent, and that he had reasonable cause to believe such transfer was preferential. The bill prayed that the assignment be held null and void as against the trustees, and that the insurance company pay the sum due under said policies to them.

Each policy provided for the payment of $2,643.11 as premium on or before the 9th day of April in each year; also, that the policy should

lapse and be forfeit to the company on the nonpayment of any premium when due. A further clause, however, provided that, should default be made in the payment of any premiums, the insurer will waive such default and accept payment of said premium provided the amount thereof, with interest at 5 per cent. from the date of default, be tendered to it within 30 days after such default. On May 9th, the last day of grace for the payment of premiums on these policies, after petition in the bankruptcy was filed and receivers appointed, Crouse paid the insurance company $6,078.38 for premiums and interest, thus saving both policies from forfeiture. On July 29, 1908, McIntyre died, and the insurance company has paid into court the proceeds of said policies, less the amount of the loan, such proceeds being $90,698.32.

The first question to be determined is whether these policies passed to the trustees upon their appointment and qualification.

The relevant provisions of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]) are as follows:

"Sec. 70. The trustees of the estate of a bankrupt, upon his appointment and qualification, shall be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt—to all property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him: Provided, that when any bankrupt shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets," etc.

The meaning and intent of Congress in enacting this proviso is in the opinion of the majority of the court very clear, when we consider the practice of insurance companies. The original idea of life insurance was to contract with the insurer that, if certain yearly premiums were regularly paid during the lifetime of the insured, a specified sum of money would upon his death be paid by the insurer to a person named in the policy as beneficiary. Under such a contract, nothing would be received from the insurer until the death of the insured, and the insured had no personal interest in the policy. Modified forms of contract have, however, become common. In some instances the policy is made payable to insured's estate, so that he retains the power to dispose of its proceeds at will. So, too, sometimes by express stipulation in the contract (as in this case), sometimes by practice of the company, the privilege is given to the insured to surrender his policy at any time (usually after several premiums have been paid) and receive a fixed sum of money in exchange. Such sum is called the "cash surrender value" of the policy. Unless such a policy passed to the trustee, the bankrupt could surrender it and himself collect the cash. Manifestly Congress "intended to prevent a debtor from investing in policies of this kind money which equitably belongs to his creditors and reaping the benefit thereof, after he has secured protection against the enforcement of debts due from him through a discharge in bankruptcy." In re Lange (D. C.) 91 Fed. 361. It is the object of the stat-

ute to place in the hands of the trustee, for distribution among the creditors, every dollar which the bankrupt could collect. Therefore, if he has a policy on which money could be collected by surrendering it, he must turn over such policy to the trustee who may thereupon surrender and collect. Having done this, there can be, of course, no possible objection to the bankrupt effecting new insurance on his own life, if some friend or relative chooses to assist him to pay the premiums. But his doing so would involve one element of hardship. The old policy may have been taken out many years before, when the assured was a young man and the annual premium low; for the new policy a much higher premium may have to be paid. Indeed, his condition of health might be such that he could not pass the examination and secure a new policy at all, and thus be unable to secure something for his family in the event of his death. It seems quite apparent from the language of the proviso that Congress was not solicitous to subject the unfortunate bankrupt to any such unnecessary hardship, and so has provided that if there is paid or secured to the trustee for the creditors all that the bankrupt could obtain by surrendering the old policy he may hold and carry such policy.

The policies in this case are of the kind referred to as having a cash surrender value; that value at the date when trustees qualified, was somewhat less than $15,000. Had the insurance company not made a loan to the bankrupts and secured itself by an assignment of the policies, the bankrupt or the trustees could have collected that amount upon surrendering them. But the company did make a loan of $15,370 on the security of the policies, and the propriety of that loan and the validity of the company's lien on the policies are not questioned. Therefore on the day the title vested in the trustees the cash which the company had agreed to pay on surrender would if surrender were claimed have been entirely absorbed in releasing the lien of the company, whether the privilege of surrender were exercised by the bankrupt or by the trustees. There was therefore nothing to pay or secure to the trustees to take the place of the money the bankrupt might obtain by surrendering because he could not obtain anything himself by such surrender, although the policy had a cash surrender value. To hold upon such a state of facts that the policies passed to the trustee as assets, unless the individual insured bankrupt, or the bankrupt firm or somebody paid the trustees $15,000, in addition to the $15,000 which the insurance company would take in satisfaction of the lien, would, in our opinion, be a clear violation of the intent of Congress as expressed in the section quoted supra. There have been many decisions construing this part of section 70, most of them are cited on the briefs, but we have found none in which the precise point now before us has been passed upon.

Since the title did not pass to trustees, they could not maintain a suit to set aside the transfer to Crouse, and the District Court correctly held that Crouse was the owner of and entitled to the proceeds.

At the time of the failure the bankrupts were indebted to Crouse on special account for securities delivered to them in the amount of $83,-363 (after making certain credits). They were also indebted to him on account of 200 shares of Pullman company stock to the amount of

$30,900. They were also indebted to him in other amounts. The special account securities and the Pullman stock were advances for which the policies were assigned as security. Without going into intricate details of his various accounts, the majority of the court are of the opinion that the District Court was right in requiring him to apply the proceeds of the policies first to the payment of the special account and next—so far as the sum will go—to the claim for Pullman stock. But we think the net proceeds only should be thus applied, and that Crouse is entitled to deduct from the proceeds received from the company the $6,078.38 which he had to pay for premiums and interest to save the policies from forfeiture.

With this modification the order is affirmed.

WARD, Circuit Judge, dissents.